[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This litigation arises out of the state's right of eminent domain as exercised through the Commissioner of Transportation. On June 15, 2001, the Commissioner filed a Notice of Condemnation together with an Assessment of Damages in the amount of one thousand ($1000) dollars for the acquisition of a forty-four one hundredths (0.44) acre of land which is a wedged-shaped, unimproved parcel situated in the town of Kent and is a portion of a larger three (3) acre "tract." The tip or end of the wedge points to the north; the southerly portion, which is the base of the wedge, is bounded by submerged wetlands owned by the defendant; the easterly boundary is formed by the junction of the condemned piece and an active state-owned railroad, and the westerly and the northerly point of the wedge abut undeveloped state land which leads up a slope to South Kent Road (State Route 827).
The wedge-shaped piece in issue occupies all of the dry land in the three (3) acre parcel, all of which is non-contiguous with other land of the defendant, which other land is generally known as Camp Leonard-Leonore, a corporate entity located in the town of Kent. Club Getaway is situated on the defendant's property and offers activities such as biking, hiking, swimming, boating and tennis, together with living accommodations for patrons.[1]
The subject three (3) acres was obtained by the defendant along with four other parcels from Trustees of the Property of the Penn Central Transportation Company in 1975.
For the last twenty years, the Fink brothers, individually or corporately, have leased the taken parcel to the town of Kent for the storage of sand and gravel, the temporary storage of town highway trucks and other heavy equipment.[2] The subject parcel is a landlocked parcel.
According to the defendant, the topographical characteristics of the CT Page 997 taken parcel cause it to be particularly suited for use as a repository for sand and gravel. The state argues that since the land had no meaningful use, the lease has been nothing more than an accommodation to the town of Kent.[3]
The defendant characterizes this use as a special use and asserts that one John Nelson, an individual contractor who currently owns property in Kent on which sand, gravel and earth products are stored, was interested in purchasing this particular piece. By a somewhat tenuous nexus, this interest of Nelson "and others" is said to create a market for this particular piece of property. He ultimately blurted out during his testimony that he would pay eighty thousand ($80,000) dollars for the property, the transaction would be a cash transaction after stating that he was ready, willing and able to purchase the property. As a result of the court's observation of the witness and the content of his testimony, the court is not inclined to accord it any great value in terms of credibility.
Each of the parties offered an expert appraiser whose testimony was an attempt to frame the value of the parcel taken. Neither was particularly accurate or impressive. Despite that finding, the court does consider that the defendant's expert appears a bit more credible than the state's expert, whose knowledge of the issues in this particular case as well as values, acreage and topography certainly was virtually useless in terms of support for the state. This finding does not, however, impress an imprimatur on the defendant's expert.
The defendant's expert testified that the defendant was wrong in asserting that the property was landlocked. He claimed that it had access over a gravel path which had been discontinued as a town road in 1935. That gravel path leads to state highway(s). He did not know what a highway driveway permit was. He conceded that one may not obtain title by adverse possession against the state, but he also asserted that a landowner could obtain an access easement by prescription over that land. This is a rather novel concept, to say the least. Both the defendant and its expert claim the value of the property to be within the ninety thousand to one hundred thousand dollar ($90,000-$100,000) range. The expert placed great weight upon one comparable located in close proximity to the subject parcel. It was also used for the same purpose. The property sold for sixty-seven thousand five hundred ($67,500) dollars in 1986, some fourteen (14) to fifteen (15) years earlier; and interpolating for the passage of time, the price was adjusted to a current figure of eighty-eight thousand five hundred ninety-four ($88,594) dollars. The adjustments made by the expert were made despite the fact that he did not increase the-sales price from 1987 to 1995. He CT Page 998 did, however, increase the sales price by 5 percent for the three years from 1995 to 1998. He then adjusted the value for appreciation of 25 percent from January 1, 1999 to the present. This figure is the product of what seems to be some magical process and leaves much to be desired in terms of assistance to the court.
There has been mention of the recognition of the lack of persuasion by the defendant's expert. of significant importance was his response to a question of valuing this parcel as a stand alone parcel of unbuildable raw land. This question was never answered and perceived apparently by the witness as an excellent example of avoidance.
An environmental professional dug three test pits on the property. He discovered concentrations of petroleum hydrocarbon, semi-volatile organic compounds, and lead contamination, each of which registered in excess of the regulatory safety standards established by the Commissioner of Environmental Protection in the remediation standard regulations for GA areas; that is, areas in which the underground water is presumed drinkable. This court is satisfied that there certainly is a need for remediation and there was some testimony about that process occurring. Regretfully, the expert who testified about the contamination of the property was never asked and never volunteered any opinion or estimate of the cost of such remediation. Therefore, while it exists, sufficient evidence to utilize it in the determining of the value of the property is sadly lacking. To reiterate, the values found by the state's expert of one thousand ($1000) dollars for the taken parcel and ninety-four thousand ($94,000) dollars as the value which would be due to the defendant in accordance with its expert's testimony, require the court to value the property in accordance with the admissible evidence that it heard and its viewing of the premises.
The defendant in this appeal claims to be aggrieved by the award as assessed by the state, and seeks an award in the amount of the difference between the Commissioner's value and the defendant's own value. The Commissioner's value of one thousand ($1000) dollars is contrasted with the defendant's value of ninety-four thousand ($94,000) dollars. The defendant claims the ninety-three thousand ($93,000) dollar difference as due and owing to it as the measure of the value of this particular piece of property. "Aggrievement is established if "there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected.'" State Medical Society v. Board ofExaminers in Podiatry, 203 Conn. 295, 300 (1987). Being an owner of property establishes that said owner has a specific personal and legal interest in the subject matter of the decision. " Huck v. Inland Wetlandsand Watercourses Agency, 203 Conn. 525, 530 (1987); see BossertCT Page 999Corporation v. City of Norwalk, 157 Conn. 279, 285 (1968). There can be no serious dispute over the fact that Camp Leonard-Leonore Corp. as the owner thereof is indeed aggrieved by the actions of the Commissioner and has the requisite standing to pursue this appeal.
The function of the trial court in condemnation cases is the determination as nearly as possible of the fair equivalent in money for the property taken. Connecticut Printers, Inc. v. Redevelopment Agency,159 Conn. 407, 410 (1970). In these cases, the burden of production and persuasion on the issue of valuation falls upon the property owner. SeeEdwin Moss Sons, Inc. v. Argraves, 148 Conn. 734, 735 (1961);Levine v. Stamford, 174 Conn. 234, 235 (1978). The court is not pursuaded that this burden has been met. Conversely, the Commissioner is required to do virtually nothing and, in the words of counsel, may stand mute. SeeMerrell v. Southington, 42 Conn. App. 292, 298, 679 A.2d 404, cert. denied, 239 Conn. 918, 682 A.2d 1003 (1996); Colaluca v. Ives,150 Conn. 521, 530 (1963); Winchester v. Cox, 129 Conn. 106, 114-15
(1942). The question of what is just compensation is an equitable one, rather than a strictly legal or technical one. The paramount law intends that the condemnee should be put in as good condition pecuniarily by just compensation as he would have been had the property not been taken.Alemany v. Commissioner of Transportation, 215 Conn. 437, 444 (1990).
In condemnation proceedings, the court is more than a trier of fact or an arbiter of differing opinions of witnesses. Its duty is that of making an independent determination of value and fair compensation in light of all the circumstances, the evidence and the court's general knowledge as well as its viewing of the premises. In visiting the property, the trier may rely on his visual observations to supplement the evidence presented for his consideration by the witnesses under oath. D'Addario v.Commissioner of Transportation, 180 Conn. 355, 366 (1980); Tandet v.Urban Redevelopment Commission, 179 Conn. 293, 298 (1979).
If the taking is a partial taking, the usual measure of damages is the difference between the market value of the whole tract with its improvements before the taking and the market value of what remained of it thereafter. Gontarz v. Berlin, 154 Conn. 695, 697 (1967); Morgan v.Hill, 139 Conn. 159, 161 (1952). Severance damages to the parcel remaining are thereby included. Meriden v. Ives, 165 Conn. 768, 773
(1974); Connecticut Printers, Inc. v. Redevelopment Agency, 159 Conn. 407,414 (1970). Severance damages compensate for the diminution of the fair market value of the remainder of the owner's property which is both unique to that land and arises as the direct and immediate result of the taking of the portions of that land by the condemning authority. TollandEnterprises v. Commissioner of Transportation, 36 Conn. App. 49, 58
CT Page 1000 (1994).
It cannot be seriously disputed that the taken parcel in this instance is not a portion of a useable larger "tract" of land. If it were, then it would ordinarily give rise to a question of severance damages. The taken parcel is the only dry portion of the "tract" as was observed from the evidence during the trial and from the view of the parcel. Clearly, in this instance and predicated upon these facts, which nullify any favorable consideration of severance damages, such an award cannot be entertained.
The owner claims that it had the right to use the South Kent Road right-of-way in combination with the subject parcel. It recites that the owner of a land abutting a highway is presumed to own the fee of the land from the center of the highway. It contends that there is no evidence that any entity other than the defendant owned the fee within the right-of-way. It continues that the presumption permits the finding that the defendant was able to use the right-of-way subject to not interfering with the highway and that the prior use of the land in the right-of-way had never been contested nor denied and that due to the change in grade it did not interfere with the travel portion of South Kent Road. Its expert asserted that a right-of-way can legitimately enhance the value of adjacent property despite the fact that the right-of-way is not owned by the adjacent property owner. He continues on by saying that even now the state enjoys the enhancement afforded by the right-of-way in combination with the subject parcel.
This "easement" theory that the defendant's expert declares and describes is a non-exclusive easement by prescription on public land. The doctrine of adverse possession will not run against the government's title to public land which is being held for public trust. Goldman v.Quadrato, 142 Conn. 398, 402-403 (1955). It should also be noted that the doctrine of easements by prescription serve to open up land employed to the public benefit to the disruption of a private use for the personal benefit of an abutter. Frillici v. Town of Westport, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 241700 (January 29, 1993, Stodolink, J.).
The town of Kent enjoyed a permissive use from the Commissioner to access over the state land to facilitate the operation of a municipal public works sand and gravel storage area on the property at issue. The use was never adverse and the state land at issue was used in conjunction with others with the safe operation of two abutting state highways. The state's license to the town cannot possibly constitute an adverse non-exclusive use which in theory would give the camp an easement by CT Page 1001 prescription over the state land. The reasons for this are that the permissive use by the town or other entity(ies) cannot ripen into an adverse, non-exclusive use by the camp and, to reiterate, a private easement cannot be adversely obtained over governmental land which is being used for public purposes.
The Commissioner has chosen to address the principle of assemblage in its brief.[4] In such an issue, the property owner takes the burden of presenting the evidence sufficient to persuade the court that as of the date of the condemnation, there was a reasonable probability of assembling all the necessary parcels at a reasonable price and thereafter developing it within the foreseeable future in a way which would meet the highest and best use test of (a) physical possibility; (b) legal permissibility; (c) financial feasibility; and (d) maximization of economic return to the real estate investor. The defendant recites in its brief that it has "anticipated that the Commissioner will argue that it is improper to value the subject parcel based on an assemblage of the subject parcel with the right-of-way for South Kent Road. To the contrary, given the circumstances presented here, an award of just compensation would seem to mandate that the valuation be based on the combined use of both parcels. However, the concept is a nonissue as it must be recognized that no "`assemblage' occurs here."[5] Therefore, it is eliminated from consideration in this decision.
The defendant postures that the so-called gravel pathway was once part of South Kent Road and upon the shift in the highway in 1935, that gravel path became an abandoned roadway. True it is that upon the abandonment of a portion of a public road, the abutting owner who has no practical access to a public road automatically gains an access easement over the abandoned portion of the former highway. The state contends that Mr. DeVoe's thesis not only inaccurate, but is simply wrong. One claiming that a parcel of land was or presently is part of a public highway must present evidence sufficient to persuade the court that the owner of the land encumbered by the public road intended to dedicate a portion of his or her land to the use of the public road and that the public accepted the dedication by improving, maintaining or using the land as a public road. Timber Harvesting, Inc. v. Ouellette, Superior Court, judicial district of Tolland at Rockville, Docket No. 050736 (February 15, 1994,Rittenband, J.). Both Mr. Fink and the state's expert testified that the subject property was landlocked. There is no evidence as to who owned the burdened land at the time of the purported dedication nor that the gravel path had ever been paved, plowed, sanded or maintained by the town of Kent, the county of Litchfield[6] and/or the state of Connecticut. This court is satisfied that the credible evidence supports the premise that the parcel is indeed landlocked. CT Page 1002
The defendant's expert also testified that the subject property has access over the gravel pathway to a state highway. He stumbled badly on the question of what a highway driveway permit is. Simply stated, no one can locate a driveway on a state highway without a driveway permit from the Commissioner of Transportation. Taylor v. Commissioner ofTransportation, Superior Court, judicial district of New London, Docket No. 514808 (December 7, 1990, Healey, S.T.R.) Taylor continues by reciting that under § 13a-143a of the General Statutes, the Commissioner must determine what, if any, impact the proposed driveway would have on highway safety before he acts. An unsupported claim that the permit could be obtained is nothing more than mere speculation. Reiterating that DeVoe did not know what a driveway permit was, there is also no evidence of any safety studies or opinions from engineers who are qualified to address such matters. His claim is totally unsupported by the evidence and, therefore, must fall.
The issue of contamination of the property was established through the state's environmental expert. There is no contradictory evidence adduced to overcome his testimony. However, the value of that testimony is substantially diminished by the failure, inadvertently or designedly, to place a value upon the remediation of that contamination. While the state's expert appraiser did mention a figure with respect to those damages, his testimony on that issue is little more than useless in this determination.
The court, in footnote 4, mentioned revisiting the issue of the lease with the town of Kent. As the state recites, the brothers Fink are sophisticated real estate investors. Were it possible to sell the subject property for eighty thousand ($80,000) dollars, it is totally implausible and illogical that they would have not accepted such offer rather than lease this parcel to the town of Kent for a nominal sum of money. This fact alone rains destruction upon the opinion of value expressed by the defendant and its expert as well as creating a monument to the concept of judges' naivete. It is also a basic principle of law that common sense is not to be left at the courtroom door; State v. Zayas, 195 Conn. 611, 620
(1985); and judges need not be more naive than other people. FederalDeposit Ins. Corp. v. Bombero, 37 Conn. App. 764, 773 (1995). This evidence is hardly worthy of belief and is found to be incredible.
The owner recites that the highest and best use of the property would be its continued use as a storage area for sand and gravel and that that characterization would be of vital importance to any prospective purchaser of the property. The state, conversely, claims that the highest and best use of this parcel was for open space in conjunction with the CT Page 1003 abutting wetlands. The court is satisfied that the defendant's assertion of the highest and best use of this property is the more naturally accurate assessment.[7]
Ultimately, the determination of the value of the land depends on the considered judgment of the referee, taking into account the diversion of opinions expressed by the witnesses and the claims advanced by the parties. Bennett v. New Haven Redevelopment Agency, 148 Conn. 513, 516
(1961); See Gentile v. Ives, 159 Conn. 443, 451 (1970). The referee is the final judge of the credibility of witnesses and the weight to be given to their testimony. Morgan v. Hill, 139 Conn. 159, 161 (1952). In this process, the trier's acceptance and use of testimony on some points does not preclude its rejection of others. Morgan v. Hill, supra, 162. The opinion of any expert is not binding on the court. Birnbaum v. Ives,163 Conn. 12, 20 (1972). In addition, the visual observations made by the trier on a visit to the property is just as much evidence as the evidence presented for consideration under oath and perhaps even more compelling. For each and all of the foregoing considerations, this court is satisfied that the Commissioner's award of damages in the amount of one thousand ($1000) dollars constitutes fair, just and reasonable compensation for this taking. The appeal is, accordingly, dismissed.
 ___________________ Moraghan, J.T.R.